# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | **Case No. 3:21-CR-00288** |
| v. | ) | |
| | ) | **JUDGE CAMPBELL** |
| | ) | |
| ERIK MAUND | ) | |

## DEFENDANT MAUND'S SUPPLEMENT TO HIS MOTION FOR NEW TRIAL DUE TO STRUCTURAL ERROR AND CONSTITUTIONAL VIOLATIONS

On May 15, 2024, this Court conducted a hearing pursuant to *Remmer v. United States* 347 U.S. 277 (1954) (the "*Remmer* Hearing") regarding unadmitted evidence and witness statements the jury reviewed during deliberations. Maund argues that *Remmer* may be the proper inquiry for extraneous information, but the harm here is one of structural and constitutional error because the jury received unauthorized exhibits with the full weight of the Court's imprimatur.[1] The *Remmer* line of cases involve external influences that the jurors knew was wrong, the very reason many *Remmer* cases involve one juror calling attention to the misconduct. The purpose of the *Remmer* hearing in these cases is to determine the type and extent of the misconduct because it is outside the Court's knowledge.

Here, the trial court discovered the inadvertent disclosure of authorized exhibits. There is no dispute about what unauthorized exhibits were provided to the jury; the

---

[1] For the sake of brevity and based on the Court's instructions Maund will not repeat arguments contained in his original Motion for New Trial (D.E. 493) and Reply in support of that Motion (D.E. 513). Nonetheless Maund references and incorporates those arguments here both generally and via specific citation.

1

parties are in dispute about the appropriate standard of review as a result of this error. Maund's argument is straightforward: when the jury receives and partially reviews unauthorized exhibits given to them by the Court, a different legal—and psychological—framework applies. The jury is not wary or inoculated from the improper influence like in the majority of the *Remmer* cases because here, the evidence comes directly from the Court. The jury is unaware that certain exhibits were not entered into evidence, and the jury reviews that extraneous information under the belief it is following the Court's instructions to consider only the evidence it is given. Unlike *Remmer* cases where other jurors are presented with research from Facebook or threats from outsiders, the improper influence here came from within. And unlike many of the *Remmer* cases where the external influence is brought to the trial court's attention during trial or deliberations, none of the parties could object because they were unaware of the inadvertent disclosure of unadmitted exhibits. Thus, based upon the testimony and the Court's May 15, 2024 Order regarding the presentation of exhibits, there are now three grounds for a new trial:

1. Structural error under *Weaver v. Massachusetts*, 582 U.S. 286 (2017) because the extraneous information so affected the framework of the entire trial since the exhibits provided to the jury had no relationship to the parties' objections and trial court's rulings throughout the trial;

2. Fifth and Sixth Amendment Due Process violations resulting from prejudicial extraneous information that was reviewed by the jury. *See, e.g., United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004) (jury received and reviewed notes from an unadmitted day planner); and

3. Sixth Amendment Confrontation Clause violation under *Smith v. Arizona*, 602 U.S. __(2024) and *Crawford v. Washington*, 541 U.S. 36 (2004) because testimonial statements by Defendant Carey were treated as admissible evidence and Defendants Maund and Brockway were denied the ability to cross-examine those statements.

## I.     THE <u>REMMER</u> HEARING PROVED THAT THE JURY RECEIVED AND REVIEWED UNADMITTED EXHIBITS WHICH CONSTITUTES STRUCTURAL ERROR

*First*, every member of the jury testified that they reviewed exhibits during their deliberations. The significance of this fact is illustrated by a counterfactual hypothetical. Imagine if the *opposite* occurred: every member of the jury testified that they reached a verdict *instantly* and *without* reviewing any exhibit. If that were their testimony, perhaps the government could argue that no structural error occurred since the significant number of unadmitted, extraneous information the jury was led to believe was admitted evidence would not have mattered. But the *Remmer* hearing allowed for "meaningful investigation into the circumstances, impact, and prejudice of the specified exhibits," D.E. 518, p. 2 (citing *United States v. Lanier*, 988 F.3d 284 (6th Cir. 2021) and demonstrated the jury reviewed and considered the exhibits. This proves actual and not theoretical harm as a result of the inadvertent disclosure of unauthorized exhibits.

*Second*, all parties agree that the unauthorized and unadmitted exhibits were intermingled with the authorized admitted exhibits.  This fact alone, combined with the jurors' unanimous testimony that they reviewed exhibits, is sufficient evidence of prejudice that warrants reversal.

*Third*, addressing the actual harm caused by disclosure of unauthorized exhibits is much greater than the potential prejudice of extraneous extrajudicial information. <u>Appendix A</u> is a chart containing nearly every *Remmer* case that describes the type of extraneous information alleged to be prejudicial. Upon review of the chart, it becomes

apparent that the vast majority of *Remmer* claims involve jurors overhearing conversations in the hallway, jurors looking at Facebook during deliberations, jurors failing to disclose relationships during voir dire, and jurors violating the trial court's instructions in nearly every way imaginable. Maund is not claiming any juror did anything improper. His claim is that actual harm occurred by following the Court's instructions, which is very different than the majority of *Remmer* claims.

*Fourth*, inadvertent disclosure of unauthorized exhibits is a rare occurrence and nearly always results in reversal. Whether the Court uses the framework of *Weaver* or *Remmer*, this situation is more factually similar to *Lentz*, *Berry*, *Barnes*, *Adams* and *Vasquez* than *Remmer*. The following examples from six different circuits mandate reversal when prejudicial evidence that was not introduced at trial came before the jury:

- *United States v. Adams*, 385 F.2d 548 (2nd Cir. 1967) (jury received writings not received in evidence);

- *United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004) (jury received and reviewed notes from an unadmitted day planner);

- *United States v. Barnes*, 747 F.2d 246 (4th Cir. 1984) (jury received and partially viewed three unauthorized exhibits);

- *Paz v. United States*, 462 F.2d 740 (5th Cir. 1972) (jury had access to book about drug trafficking);

- *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970) (jury found $750.00 cash within an exhibit and crime involved monetary gain);

- *United States v. Berry*, 92 F.3d 597, 598–602 (7th Cir. 1996) (jury took unadmitted transcripts which identified defendant as the speaker back during deliberations);

- *United States v. Vasquez*, 597 F.2d 192 (9th Cir. 1979) (court's file which included inadmissible evidence was inadvertently left in the jury room);

4

- *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996) (jury received tapes not admitted into evidence); and

- *Dallago v. United States*, 427 F.2d 546 (D.C. Cir. 1969) (prejudicial exhibit erroneously provided to the jury).

The Sixth Circuit is the only circuit where the defendant bears the burden to demonstrate prejudice. But even under that analysis, the result is the same. If, like here, the extraneous information reviewed by the jury was unadmitted evidence, specifically excluded by the Court because it was either inadmissible hearsay or would have opened the door to the presentation of additional rebuttal evidence, then a defendant has met their burden to prove prejudice.

## II.   THE <u>REMMER</u> HEARING PROVED THAT THE JURY RECEIVED AND REVIEWED UNADMITTED PREJUDICIAL EXHIBITS

### A.   The Cumulative Testimony of the Jurors Demonstrates that They Reviewed Unadmitted, Extraneous, and Prejudicial Information.

The *Remmer* Hearing occurred on May 15, 2024, approximately six months after the jury was discharged from service. Because of the passage of time, none of the jurors had a clear, specific recollection of every event that occurred during deliberations. Nonetheless, the specific recollection of certain jurors combined with the general recollection of each of them, paints a picture of a jury that was exposed to the extraneous prejudicial information in form of at least Carey Exhibit 3 and Carey Exhibit 4.

*First*, the jurors' reviewed the prejudicial exhibits. During the *Remmer* Hearing, the Court posed a series of questions to each juror. One of those questions asked whether "when [the juror] was in the jury room for deliberations, did [they] listen to any recorded conversations from a flash drive or USB drive." *See, e.g.,* Transcript of May 15, 2024

5

*Remmer* Hearing ("Transcript") at 43:8-10 ("The Court: Okay. Now, when you were in the jury room for deliberations, did you listen to any recorded conversations from a flash drive or a USB drive? [Juror 6]: I believe so."). To one degree or another every juror answered in the affirmative. *See id.* at 49:19-50 (Juror 6); 53:25-54:4 (Juror 4); 64:23-65 (Juror 11); 74:22-25 (Juror 2); 86:22-25 (Juror 9, recalling specific USB drive containing Carey Exhibit 3); 96:21-24 (Juror 1); 106:10-13 (Juror 3); 113:25-114:4 (Juror 5) 134:2-6; 140:21-141:6; 144:20-145:5 (Juror 7); 150:16-19 (Juror 10); 161:23-162:1 (Juror 12); and 172:12-16 (Juror 13).

This testimony alone proves actual prejudice. Only the defendants included evidence that was sent back to the jury on USB or Flash drives. Of the three drives that were sent back to the jury, two were included in Carey's exhibit binder and one in Maund's exhibit binder. One of the two in the Carey exhibit binder contained only Carey Exhibit 3. The USB drive in Maund's exhibit binder contained further unadmitted, extraneous information. *See* Notice, D.E. 502. Each and every juror confirmed that the jury as a whole viewed evidence from a flash or USB drive, there is a 2 in 3 chance that they viewed a drive with extraneous information on it, and a one in three chance that they watched Carey Exhibit 3, which contains presumptively prejudicial extraneous information.

*Second*, the general recollection of the jurors as a whole was not limited to simply watching recorded conversations from the USB drives in the defendants' exhibit binders. When questioned about what "recorded conversations" they watched, not every juror had a specific recollection, but those that did strongly suggested they listened to Carey

Exhibit 3. Carey Exhibit 3 contained the unreacted version of a meeting between Defendant Brockway and David Conway, a cooperating witness. That meeting took place inside of David Conway's vehicle, during which Brockway made the statement "Uh, Adam didn't know any of this shit," the admission of which this Court determined would have opened the door to the presentation of additional evidence by both Brockway and Maund. Several jurors recalled certain aspects this conversation. When asked if there was "Anything about the conversations [you listened to] resonate with you, where they took place, that sort of thing?" Juror 9 stated "Yes. It was an in-person conversation between Conway and Brockway." 87:1-14. Juror 12 recalled listening to a conversation between Brockway and "the other gentleman, I don't remember his name, but the big guy – the big guy, the one of them that was working undercover apparently" 162:2-17. And Juror 13 described listening to "an undercover conversation" which took place "in person, maybe one was in a vehicle, a bar or a restaurant."[2]

Even with the passage of time between Maund's conviction and the *Remmer* Hearing, three jurors had much more specific recollection of viewing the prejudicial extraneous information contained on Carey Exhibits 3 and 4. Juror 9, had one of the clearest recollections of what the jury watched on the USB drives provided to them. He 9

---

[2] The other USB drive in Carey's exhibit binder contained a recording of a conversation between David Conway and Adam Carey surreptitiously taken by Conaway on a watch that the FBI had provided to him. See Carey Exhibit 2. Notably, other jurors described aspects of this conversation when asked what media they recalled looked at on USB drives. For example, Juror 6 recalled listening to a conversation where "he had his watch and I guess the watched taped something" TRANS 43:22-23. Juror 4 remembered "listening to some of the conversations at – I think they were at restaurants." This testimony also suggests that the jury looked through Carey's exhibit binder and played media from USB drives in that binder—a binder which also contained Carey Exhibits 3 *and* 4.

7

also specifically recalled the USB drive containing Carey Exhibit 3.

When asked if he recalled "listen[ing] to any recorded conversations from a flash drive or USB drive" Juror 9 responded "Yes, sir" and recalled that one "was an in-person conversation between Conway and Brockway." Transcript at 86:22 – 87:10. When asked whether he recalled the specific USB drive that contained Carey Exhibit 3, Juror 9 responded as follows:

> **Juror 9:** I believe I saw the flash but I'm not 100 percent. But I believe I saw the flash drive.
> **The Court:** That specific flash drive? I know it's a picture of one. There might have been other 17 flash drives. Do you know whether that was –
> **Juror 9:** No, that looks very familiar.
> **The Court:** Okay. And what about it looks familiar to you?
> **Juror 9:** The black color and the red writing.
> **The Court:** Okay. Do you know whether or not -- did you access any information on the flash drive that you recall? Or do you just recall seeing the flash drive?
> **Juror 9:** I recall seeing the flash drive. I believe we used the flash drive to -- on the TV to listen to a recording.

*Id.* Juror 9 was not an ordinary juror. Instead, he was elected by his fellow jurors as the foreperson the Jury and was charged with this Court to "help to guide your discussions, and will speak for you here in court." This, combined with Juror 9's clear recollection of what he did, and did not view, further bolster his testimony.

Juror 2 had similar specific recollections about both Carey Exhibit 3 *and* Exhibit 4, the transcript of the conversation on Carey Exhibit 3. First, while unsure of the specific transcript, Juror 2 unequivocally recalled reviewing one:

> **The Court:** Okay. When you were in the jury room for deliberations, do you recall seeing a written transcript of any recording or testimony?
> **Juror 2:** Yes.
> **The Court:** Do you recall which transcript that was?
> **Juror 2:** I do not recall.

Transcript at 74:2-8. Juror 2 was shown a copy of Carey Exhibit 3, and the following exchange occurred:

**The Court:** Okay. You mentioned earlier a transcript. Do you know whether the transcript – the portion of the transcript that's in front of you, do you know whether that's the specific one you recall reviewing?

**Juror 2:** I do not know if this is the specific one, but I do remember the conversation was between those two people.

**The Court:** Which two people?

**Juror 2:** Conway and Brockway.

**The Court:** Again, you recall seeing a transcript of this as opposed to just listening to the conversation?

**Juror 2:** Both, yes.

**The Court:** Because transcripts were played -- or provided during the trial. And do you specifically remember looking at a transcript during your deliberations as opposed to seeing it in trial?

**Juror 2:** I'll say I don't recall because I feel like we did because we couldn't understand parts of the recording.

**The Court:** Okay. So during deliberations you have a memory of looking at a transcript?

**Juror 2:** I feel like I do, yes.

*Id.* at 76:18 – 77:16.

Under questioning by the government, Juror 2 maintained that she had viewed a transcript in the jury room and that transcript was of the conversation contained in Carey Exhibit 3. She also confirmed that the entire Jury listened to Carey Exhibit 3.

**Q:** Okay. And then you said that initially you recall seeing a transcript in the jury room?

**A:** I feel like I did, yes.

**Q:** Okay. And -- but you said there was no discussion about that?

**A:** No, not really any discussion

…

**Q:** And you can look at it again. You said you didn't recall seeing Exhibit 4.

**A:** Exhibit 4 is - -

**Q:** If you'd just look at it.

**A:** the conversation? Let me make sure I have the right one. One, two, three, four. Exhibit 4 is a conversation. I do remember us listening to a conversation between those two people. As far as the transcript goes, I can't recall. So I don't want to say 100 percent one way or the other.

**Q:** So that transcript Exhibit 4 is of the conversation that you recall listening to in the deliberation room?

**A:** Correct

**Q:** Okay. And would that have been the only potential transcript that you remember or were there transcripts of other recordings that you think you remember or do you know?

**A:** I just remember us having a discussion around one recording that we could not hear clearly. There were -- it was kind of jumbled in certain places, like maybe air or something blocking voices. I felt like we looked at a transcript to try to get through some of that. But, again, I could be misremembering.

**Q:** The conversation that you said you had a hard time hearing, do you remember what that was a recording of?

**A:** It was a recording -- they were at an outside restaurant and then it moved to the truck. That's

9

the recording that I'm referring to. I can't remember the conversation in-depth, though.

*Id*. at 81:22 – 83:23

Juror 2 confirmed that her memory had faded in the six months since the jury deliberated. But, she clearly recalled looked at a transcript during deliberations and there was only one transcript provided to the jury during deliberations—Carey Exhibit 4.[3] Her recollection was even clearer that the jury listened to the conversations transcribed in that transcript, i.e. Carey Exhibit 3.

The clearest recollection of having listened to Carey Exhibit 3 came from Juror 11. She confirmed that the jury listened to recording on USB drives, describing one that "took place in a car." Transcript at 65:5. When asked by the government what specific statements she recalled in the recording the jury listened to from a USB drive, Juror 11 stated that the term "but if you're mobile, they're never gonna find the original X" stood out to her. *Id*. at 70:24 – 71:11. That statement is contained in the first seven seconds of Carey Exhibit 4. *See* Carey Exhibit 4, Carey Exhibit 3.

In sum, the *Remmer* Hearing established that: (1) every juror recalled listening to media off of a USB drive; (2) five jurors recalled aspects of the conversation contained in Carey Exhibit 3 or Carey Exhibit 2, the other USB drive in the Carey exhibit binder; and (3) three jurors had clear specific recollections of the jury plugging in the flash drive that

---

[3] Since none of the jurors recalled underling Carey Exhibit 4 or even making marks on exhibits, it appears that the emphasis on the phrase "Uh Adam didn't know any of this shit" was already on Carey Exhibit 4 when it was reviewed by the jury. This emphasis would of course further heightening the prejudicial impact since it would have drawn the attention of Juror 2—and any other juror who received the transcript—to the specific line that this Court first ordered redacted and later ruled would have opened the door to Maund and Brockway submitting additional rebuttal evidence and recalling Peled.

contained only Carey Exhibit 3, reviewing Carey Exhibit 4 and Exhibit 3, and specific statements contained on Carey Exhibit 3.  Taken together this evidence sufficiently establishes that the Jury was exposed to extraneous information contained in CAREY Exhibit 3 and 4.  *See United States v. Toscano*, 2008 U.S. Dist. LEXIS 45663, at *5-6 (C.D. Cal. Jun. 10, 2008) (applying a "preponderance of the evidence" standard to a defendant's required showing that "the jury was exposed to, or considered, extrinsic information during deliberations.)  Because the information is prejudicial there must be "no reasonable possibility" that it affected the jury's verdict.  *See United States v. Johnson*, 954 F.3d 174, 180 (4th Cir 2020) (There must be "no reasonable possibility that the jury was influenced by" prejudicial external information.); *United States v. Reynolds*, 64 F.3d 292, 296 (7th Cir. 1995) (interpreting Remmer to require a showing that there is no reasonable possibility the verdict was affected by prejudicial external information.  That is impossible given jury listened to the contents of Carey Exhibit 3, at least one member of the Jury reviewed the transcript (with its included emphasis) in Carey Exhibit 4.

### B.  The Unadmitted Exhibits Were Prejudicial to Maund.

Three pieces of extraneous information that were provided to the jury were the subject of evidentiary rulings by the Court.  Two of them—Carey Exhibits 3 and 4—include the line "Uh, Adam didn't know any of this shit" had been redacted out of a copy of the same conversation submitted by the government.  The third - a summary chart of wire transfers from Maund to Peled—contained the hearsay statement "*Homicides occur*" Government Exhibit 359 (emphasis in original) which was redacted in trial but not redacted when provided to the jury during deliberations. Each of these pieces of

11

extraneous information were excluded by the Court's evidentiary rulings and prejudice can be presumed due the Court's own rulings. Four reasons illustrate actual harm to Maund.

*First*, Brockway's statement to Conway, "Uh, Adam didn't know any of this shit" is prejudicial to Maund because, like in *Lentz*, *Berry*, *Barnes*, *Adams* and *Vasquez*, it directly contradicted Maund's defense that Adam Carey impulsively committed the murders. *Second*, if "Adam didn't know any of this shit," the implication is that somebody else did, and the jury could have inferred that person was Erik Maund. *Third*, Brockway did not testify, and due to his Fifth Amendment privilege, Maund had no way of compelling his testimony to cross-examine him about this statement. *Fourth*, the Court determined that that Carey sought admission of that line—which he was free to do—it would open the door to rebuttal evidence. Maund and Brockway, in turn, indicated that it the line was admitted they would seek to introduce other significant evidence, including evidence of a July lunch meeting in Austin Texas between Carey, Brockway and Peled and seek to recall Peled to the stand. *See* Motion, D.E. 349, p. 5.

While the Sixth Circuit does not appear to have addressed this exact set of facts, other circuits have. In *Lentz*, the district court for the Eastern District of Virginia was confronted with a similar set of facts, where evidence the court has specifically excluded somehow found its way back to the jury. The court there "took great care … to exclude the majority of this evidence before trial because it was clear that this evidence was unreliable and untrustworthy and if submitted to the jury would surely have a substantial effect upon them" concluding that "demonstrated that the submission of

extraneous evidence is significant enough to justify the presumption that the error was prejudicial." *United States v. Lentz*, 2004 U.S. Dist. LEXIS 29650, *78-79. The Fourth Circuit agreed. *Lentz*, 383 F.3d at 219 ("Furthermore, there is a presumption of prejudice where such improper evidence has been made available to the jury."). The facts here are the same. The Court has already determined that the extraneous information contained in these three exhibits was either inadmissible (Government Exhibit 359) or triggered Maund's right to admit significant rebuttal evidence (Carey Exhibits 3 and 4). As such, prejudice can not only be presumed, but actual harm occurred.

### III. PROVING ACTUAL PREJUDICE WITHIN THE CONFINES OF RULE 606

When there is a colorable claim of extraneous information being provided to a jury, a defendant is entitled to a "constitutionally meaningful *Remmer* hearing." *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021) *quoting Ewing v. Horton*, 914 F.3d 1027, 1033 (6th Cir. 2019). The government will argue that because the jurors did not specifically testify that they relied upon Carey Exhibits 3 and 4 in finding Maund guilty of Count One, there is no actual prejudice to the verdict. This is where the unadmitted exhibit line of cases in *Lentz*, *Berry*, *Barnes*, *Adams* and *Vasquez* diverge from the extraneous information *Remmer* cases. Both may require a *Remmer* hearing, but the difference lies in proving actual harm.

*First*, Federal Rule of Evidence 606(b)(2)(A) and (B) create exceptions for extraneous information *improperly* brought to a juror's attention or outside influence *improperly* brought to bear on a juror. Most *Remmer* hearings inquire about when the jury was exposed to outside influence, how the court dealt with the outside influence during

13

trial, and the number of jurors exposed to the outside influence. These are factual inquiries about matters that were improper. But here, there was nothing "improper" about the jury reviewing exhibits they were provided—the Jury, the parties, and the Court believed that all the evidence in the possession of the jury during deliberations had been admitted and was entirely proper for them to review. It was not until 20/20 (a news organization) requested copies of the exhibits that the Court realized anything was amiss. At the *Remmer* Hearing, the Court went as far as it could within the confines of Rule 606 inquiring about what the jury reviewed. Rule 606 prohibits any further inquiry about any statements, mental processes, or effect on the juror's verdict. Maund proved actual prejudice within the confines of Rule 606.

*Second*, there was a delay in the parties learning of the presentation of extraneous information to the Jury. Approximately one month passed between when the Court became aware of the issue and when the parties were notified on January 29, 2024.[4] While the Sixth Circuit has recognized that the passage of time, alone, does not necessarily impact the constitutional sufficiency of a *Remmer* hearing, it has expressed concerns with the passage of time that occurred by no fault of the defendants. *See United States v. Lanier*, 988 F.3d 284, 297 (6th Cr. 2021) (Court related delays in preserving evidence denied defendants a "meaningful opportunity to prove juror bias.") Here, the delay between learning of the multitude of extraneous information that made its way back to the jury

---

[4] While Maund is unaware of the exact date that the Court or its staff became aware of the extraneous information, Court personnel who attended the first review of the exhibit binders suggested that it was sometime in December, 2023 as the clerk's office was responding to requests from the media for copies of exhibits.

and informing the parties allowed the memories of the jury to further erode by no fault of Maund.

*Third*, the parties were not provided with all of the relevant information concerning the handling of the exhibit and the extent of the prejudicial extraneous information that was provided to the jury in advance of the hearing, depriving Maund (and the Court) to questions the jurors thoroughly at the *Remmer* Hearing in a constitutionally adequate manner. *See Lanier* at 296 (lack of relevant information "undermined the [defendants] ability to question Juror 11 thoroughly at the *Remmer* hearing in a constitutionally adequate manner."). Unlike *Lanier*, this lack of information appeared to stem from the sheer volume of extraneous information that found its way to the jury and the absence, on the day of the hearing, of Court staff involved in the transfer of exhibits to and from Jury. The effect was the same, however.

While the Court provided a Notice to the parties of issues with exhibits and other information that was presented to the Jury that Notice did not set forth all of the issues that had been identified by Court staff. After seeking permission to re-examine the exhibit binders in advance of the *Remmer* hearing, counsel for Maund and Brockway jointly reviewed the exhibits. In doing so, they determined that the CD which contained Government Exhibit 359 had a note on it stating: "Not redacted, should be redacted per transcript." During the *Remmer* hearing, the Deputy Clerk of Court indicated that note was in her handwriting and she had put it on the CD containing Government Exhibit 359. Transcript at 28:17 – 29:11.

While Defendants were able to question the jurors about Government Exhibit 359,

15

the fact remains that it was identified by Court staff as containing extraneous information that should not have been provided to the jury in but not included in the Notice to the parties. Instead, it came to light because counsel for Maund and Brockway sought to examine the exhibits a second time. While counsel has no doubt that the Court and its staff have thoroughly reviewed these exhibits and the transcript sections addressing their admission, this late discovery of the presentation of further prejudicial extraneous information provided to the jury raises the specter that there may be yet additional—and unidentified—extraneous information in the exhibits.

In addition to the late identification of Government Exhibit 359, key court personnel who could have shed light on the manner the exhibits were handled when they were received back from the jury were absent on the day of the *Remmer* Hearing. This resulted in both the parties, and the Court, asking jurors questions about the documents they reviewed under the misapprehension that all the defense exhibits were collected on one binder.

When the parties were first allowed to review the exhibits that were received back from the jury, they were collected in three binders—two white binders containing the Government's exhibits and a single red binder containing the collected exhibits of all three defendants. As the Court is aware each party had its own binder color, with red assigned to Maund.[5] The cover of the red binder contained Maund's original typewritten cover page, which had handwriting on it indicating that the binder also contained both

---

[5] Carey's exhibits were in a small black binder and Brockway's in a small white binder with a blue slip sheet cover. The government's exhibits were contained in two large white binders.

Brockaway and Carey's exhibits. Maund first raised this issue in his Motion for a New Trial, stating that it appears that one of Maund's red binders was used to combine all of the defense exhibits into a single binder" and that his counsel "did not endorse the combining of all defense exhibits into a single binder, and is unaware of who combined" them. D.E. 493, p. 5, n. 1.

At the *Remmer* Hearing, the parties and the Court conducted questioning under the assumption that the exhibits had been combined prior to being presented to the jury. At the outset of questioning, the following sidebar occurred:

> **Mr. Thomas:** We don't see an issue showing we don't see an issue showing the exhibits, but I think we'd also like to show him the binders and say, there's three binders, two white government binders, one red defense binder. Do you recall looking at exhibits in the red binder. We didn't raise that initially, Your Honor.
> **The Court:** Just the question, did you look at anything in the red binder?
> **Mr. Thomas:** Yeah, did you open the red binder.
> **The Court:** Do you have any issue with that?
> **Mr. McGuire:** I'm fine with that.
> **The Court:** Do you want to do that?
> **Mr. Thomas:** Yeah, *but I think we need to bring the binders in.*
> **The Court:** Cynthia, *can we get all the exhibit binders* and put them right here?

Transcript at 44:21 – 45:14 (emphasis added). As Maund's counsel made clear, they believed that it was important to examine the witnesses about whether they recalled looked at the only defense exhibit binder then available, which contained seven out of the nine pieces of extraneous information identified on the Court's Notice. The Court agreed this was appropriate, and directed its staff to "get all the exhibit binders" and put them in view of the witness stand.

Subsequently both the parties and the Court asked various jurors about their recollection of looking at extraneous information in the red binder.

However, the Court later informed the Parties that the binders presented to the

Jury during the *Remmer* Hearing were not the binders that were used by the jury during its deliberations. Specifically, "[a]fter the jury verdict, the Courtroom Deputy consolidated the defense exhibits into a single binder and made the handwritten notations on the binder slip sheet indicating that the binder contained exhibits from each of the defendants by writing "Brockway Exhibits" and "Carey Exhibits" on the slipsheet, and that the binder contained a flash drive by writing "flash drive included." D.E. 541 ¶ 1.[6] Instead of the exhibits being combined before the exhibits were presented to the jury, as the Parties and Court presumed at the *Remmer* Hearing, this "consolidation of the defense binders and all of the marking on the slip sheet were made after the jury delivered its verdict." This information, which the parties were unable to obtained on the date of the Remmer Hearing because of the absence of the Courtroom Deputy, was important to how the parties framed their questions. As set forth above, counsel for Maund asked the majority of the jurors if they recalled opening or reviewing exhibits in the red binder, under the mistaking impression that was the only defense binder available to the jury. Both counsel for the government and the Court did as well. *See* Transcript at 121:10-19 (Questioning by Ms. Farzad of Juror 5: "Q. Okay. So looking at these binders, they contain exhibits. And now it sounds like you're having your memory come back in answering these questions. It sounds like you're now saying that you probably looked at

---

[6] The disclosure of this information was surprising because Maund had previously raised it in his Motion for New Trial. *See* D.E. 493 ("The exhibits provided to the jury were broken out into two binders: one containing the government's exhibits, and the second containing the collected exhibits of each of the defendants. The binder containing the collected exhibits of all defendants was a red binder."). The Court did not address this apparent misstatement of fact in its substantive order addressing that motion and setting the *Remmer* Hearing. *See* D.E. 518.

some of them, not all of the exhibits; is that right? A. Right. Q. So is it correct to say, then, that you personally did not flip through every single page in all of these binders? A. That's correct, yes. I did not."); 161:3-18 (Questioning by the Court of Juror 12: "The Court: I want to go back to your deliberations at the end of the trial. When you went back to the jury room at the end of the trial to deliberate, did you review all of the exhibits or only certain ones? [Juror 12]: All of them. The Court: You see those binders right here? [Juror 12]: Uh-huh (affirmative) The Court: It has a number of tabs. Do you think you individually went through and looked at each one? [Juror 12] No, I did not. The Court: So individually you looked at certain of them, but not all of them? [Juror 12] Yeah."). The misapprehension of the parties and the Court about what binders had been available to the jury during deliberations rendered the answers to these important questions meaningless.

Based on the Court's May 20, 2024 Order, it appears that the defense exhibits were provided to the jury in three binders, each the respective color used by that individual defendant. Carey Exhibits 3 and 4, which were a particular emphasis of questioning during the *Remmer* Hearing, would therefore have been contained in a small black binder with a completely different cover page. Thus, each question asked to the jurors concerning whether they opened the binder containing those extraneous (and prejudicial) was framed with the wrong color. Moreover, the fact that the jurors were asked about a set of binders that did not match the set they had access to during deliberations—both in color *and* number—injected additional confusion, impacting their already depleted memories of events that occurred in the jury room. As a result, Maund was denied a

19

constitutionally meaningful opportunity to question the jurors about whether they were exposed to the extraneous prejudicial information at issue. Given that the juror have now been questioned, and the defense exhibits were combined well before the parties ever had an opportunity to question the jury, this defect cannot be cured.[7] The only remedy available is a new trial.

Respectfully submitted,

**BARNES & THORNBURG, L.L.P.**
827 19th Avenue, Ste. 930
Nashville, Tennessee 372203
Telephone: (615) 621-6019

By: s/ *J.D. Thomas*
J.D. THOMAS
Email: JD.Thomas@btlaw.com

**MINTON, BASSETT, FLORES & CARSEY**
*A Professional Corporation*
1100 Guadalupe
Austin, Texas 78701
Telephone: (512) 476-4873
Facsimile: (512) 479-8315

By: s/ *Samuel E. Bassett*
SAMUEL E. BASSETT
State Bar No. 01894100
Email: sbassett@mbfc.com

PERRY Q. MINTON

---

[7] To be clear, there is no indication that combination of the defense exhibits was anything out of the ordinary. At the time the Court and the parties were unaware of the issues with the exhibits and the fact that prejudicial extraneous information had made its way to the jury. But what the combination of the defenses exhibits was not out of the ordinary, it does impact the defendants' ability to conduct a constitutionally meaningful *Remmer* hearing and ask questions about what binders the jury may or may not have opened or viewed evidence out of when those binders no longer exist in the form they were used by the jury.

State Bar No. 24063296
Email: pminton@mbfc.com


**SUMPTER & GONZÁLEZ, L.L.P.**
3011 N. Lamar Blvd., Ste 200
Austin, Texas 78705
Telephone:  (512) 381-9955
Facsimile:   (512) 485-3121


By: s/ *David M. Gonzalez*


DAVID M. GONZALEZ
State Bar No. 24012711
DAVID@SG-LLP.COM


**ATTORNEYS FOR DEFENDANT
ERIK MAUND**

## CERTIFICATE OF SERVICE

By my signature below, I do hereby certify that on the 21st day of June, 2024 a true and correct copy of Defendant's Brief was filed under seal, and counsel will provide a copy to all parties of record via electronic mail.

/s/ *David M. Gonzalez*
David M. Gonzalez