UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) Case No. 3:21-CR-00288 |
| v. | ) |
| | ) JUDGE CAMPBELL |
| | ) |
| ERIK MAUND | ) |

**SUPPLEMENTAL REPLY BRIEF OF ERIK MAUND**

**I. The Government's Authority Supports the Defense's Argument That the *Remmer* Framework Does Not Fit the Facts Present Here.**

The government fails to address the most important legal argument: *Remmer* may be the proper inquiry for extraneous information, but the harm here is one of structural and constitutional error because the jury received unauthorized, excluded exhibits the Court previously ruled would trigger introduction of additional evidence by the defense. No other published case has the unique these facts where an exhibit: i) had already been determined to be inadmissible in a joint trial due to hearsay and Confrontation Clause and *Bruton* concerns; ii) has been ruled would have opened the door to additional evidence; iii) the jury did not bring the unauthorized exhibits to the Court's attention, iv) the Court did retrieve the exhibit during deliberations; and v) the Court did not provide a curative instruction.

The government cites no authority addressing the specific issue of unadmitted exhibits being provided to the jury. Instead, five of the cases it cites involve internal problems within the jury, nothing like the structural problems present here;[1] while three—*Lanier*, *Mack* and *Pennell*—

---

[1] *United States v. Kechego*, 91 F.4th 845, 851 (6th Cir. 2024) (jurors took out their phones whenever disagreeing with the jury foreperson during deliberations); *United States v. Robinson*, 872 F.3d 760, 766-67 (6th Cir. 2017) (fight between jurors after a racially charged remark); *United States v. Frost*, 125 F.3d 346, 376-77 (6th Cir. 1997) (juror lied down in Clerk's office for twenty minutes because of chest pains); *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *9-10 (6th Cir. 2022) (juror familiar with neighborhood described at trial and made statements about

all involve matters outside of court that would be proper for a *Remmer* inquiry.[2]

But most significantly, two of the cases cited by the government point to an entire body of case law outside of *Remmer*. The facts of *United States v. Sababu*, 891 F.2d 1308 (7th Cir. 1989) are most closely analogous to this situation. There, transcripts excluded from evidence were sent into the jury room. The jury brought it to the judge's attention, and the judge immediately ordered that all government exhibit binders be removed from the jury room and be rechecked for the presence of inadmissible evidence. The trial judge met with the two parties and instructed them to draft a curative jury instruction. The Seventh Circuit found the curative instruction, and the fact that the defendant was acquitted on the counts that related to the transcript, meant there "was no reasonable possibility that the transcript affect the verdict. *Id*. at 34.

Similarly in *United States v. Walton*, 403 F. Supp. 3d 839 (C.D. Cal. 2018) the jury discovered alerted the judge to exhibits that were not introduced into evidence and the court removed the exhibit and issued a curative instruction. The government's citation to *Walton* helpfully points to the proper legal standard announced in several circuits for the issue present here. According to *United States v. Prime*, 431 F.3d 1147, 1157 (9th Cir. 2005) "[a] defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is a reasonable possibility that the extrinsic material could have affected the verdict." *See also Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988) (quoting *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir.1979); *Paz v. United States*, 462 F.2d 740, 745 (5th Cir. 1972); *Farese v. United States*, 428 F.2d 178, 180 (5th Cir. 1970). In sum, these cases hold that when a jury is

---

"guys like them"); and *In re Sittenfield*, 49 F.4th 1061, 1066-67 (6th Cir. 2022) (juror posted on her private Facebook page during jury deliberations).
[2] *United States v. Lanier*, 870 F.3d 546, 548-49 (6th Cir. 2017) (juror communicated with an assistant district attorney to discuss jury deliberations); *United States v. Mack*, 729 F.3d 594, 605-06 (6th Cir. 2013) (juror could have overheard FBI agents discussing the case during lunch); and *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) (jurors received phone calls from an anonymous caller instructing them to find the defendant guilty).

exposed to facts that have not been introduced into evidence, couched as evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to the extraneous information. *Dickinson* at 406. As The Court in *Farese* summarized:

> It is a fundamental principle that the government has the burden of establishing guilt solely on the basis of evidence produced in the courtroom and under circumstances assuring the accused all the safeguards of a fair trial.
>
> . . . Judicial control of the juror(s') knowledge of the case pursuant to the laws of evidence is fundamental to the prevention of bias and prejudice. Our rules of evidence are designed to exclude from consideration by the jurors those facts and objects which may tend to prejudice or confuse. Evidence presented under the exclusionary rules is subject to cross-examination and rebuttal. It is therefore necessary that all evidence developed against an accused "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."

*Farese* at 179-180, citing *Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965).

Other circuits have applied this test in a variety of ways. The Second, Tenth and D.C. Circuits follow the view that if there is the "slightest possibility" harm could result reversal is required. *United States v. Marx*, 485 F.2d 1179, 1184 (10th Cir. 1973; *Dallago v. United States*, 138 U.S.App.D.C. 276, 290, 427 F.2d 546, 560 (1969); *United States v. Adams*, 385 F.2d 548, 550-51 (2nd Cir. 1967). The Seventh and Eighth Circuits have stated that it is sufficient to require reversal if the error "might have operated to the substantial injury of the defendant." *Osborne v. United States*, 351 F.2d 111, 119 (8th Cir. 1965); *United States v. Grady*, 185 F.2d 273, 275 (7th Cir. 1950). A series of Fifth Circuit cases have established that if there is a "reasonable possibility" the error affected or prejudiced the verdicts, then reversal is required. *United States v. Howard*, 506 F.2d 865, 866 (5th Cir. 1975); *Paz v. United States*, 462 F.2d 740, 746 (5th Cir. 1972).

The Ninth Circuit has developed the most fulsome nine factor test to determine whether the prosecution has met this burden[3] when unadmitted evidence is provided to the jury. Those

---

[3] Admittedly the Sixth Circuit is the only circuit that places the burden on a defendant to show "prejudice" from improper contact with a jury. *See, e.g., United States v. Davis*, 177 F.3d 552, 557 (6th Cir., 1999). But as discussed below, this Court has already established the prejudicial

factors are:

(1) whether the material was actually received, and if so, how;
(2) the length of time it was available to the jury;
(3) the extent to which the jury discussed and considered it;
(4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations;
(5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict;
(6) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial;
(7) whether a curative instruction was given or some other step taken to ameliorate the prejudice;
(8) the trial context; and
(9) whether the evidence was insufficiently prejudicial given the issues and evidence in the case.

*Id*.

The last four factors are particularly relevant here, and point to why a new trial is necessary. *First*, the evidence in Carey Exhibits 3 and 4 is not cumulative, it is unique. The statement "Adam didn't know any of this shit" is the sole statement on any recording offered by the government suggesting Adam Carey was somehow uninvolved in the murders. *Second*, there was no curative instruction given that covered Carey Exhibits 3 and 4. All the defendants sought severance, which the Court denied, agreeing with the government. As a result, the Court gave numerous limiting instructions. But none of those instructions covered Carey Exhibits 3 or 4. *Third*, in the context of the trial, what Adam Carey knew was not a mere peripheral issue. It was hotly debated, and went to the very core of the individual theories of defense presented by each defendant. And *forth*, there is no question the statement "Adam didn't know shit" was prejudicial standing alone. The Court recognized as much, and ruled that if admitted the statement opened the door to both Maund and Brockway presenting evidence rebutting it, including recalling Peled.

---

nature of Carey Exhibits 3 and 4. Moreover, counsel have been unable to identify any Sixth Circuit case that addresses the facts present here: extraneous information, determined by a court to be inadmissible and prejudicial standing on its own, disguised as otherwise admitted exhibits, and considered by a jury.

There is good reason for a differing standard for the presentation of unadmitted evidence to a jury, as opposed to the extrajudicial contact addressed in *Remmer*. The jury here had no reason to believe that any of the extraneous information it was exposed to (including Carey Exhibits 3 and 4) was improper.[4] Throughout the trial, and during its charge, the Court instructed the jury to consider only admitted evidence. All of the extraneous information was presented to the jury as if it was admitted evidence, down to being included in the very binders the Court provided for the Jury to review. The jury had no reason to believe they were doing anything improper by following the Court's instructions. This is why courts considering analogous facts determining the submission to the jury of unadmitted evidence, disguised as admitted exhibits, necessitates a new trial. *See, e.g., United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004) (new trial required after jury received and reviewed notes from day planner that had been specially excluded); *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984) (Same, noting that "if prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial."); *Dallago* 427 F.2d at 556 (failure to redact specifically excluded pages from government exhibit requires new trial even where unclear whether jury reviewed).[5]

There is no question two people died, that money was exchanged, and that statements were made after the murders by various defendants. But the central question of who knew what, and

---

[4] From the outset of its Response, the government appears to also misapprehend this important fact, stating that it "submits that the proof in the record does establish that the *unauthorized communication* did not affect the jury's verdict." But this is not an "unauthorized communication" case, like *Lanier* where a juror spoke to someone during deliberations they knew they should not have communicated with. Instead, it is much more like *Lentz* and *Dallago*.

[5] Each of these cases was decided after *Remmer*, but none lean on *Remmer*. Instead, they distinguish between unadmitted evidence, disguised as admitted evidence, and the kind of extrajudicial conduct the Supreme Court addressed in *Remmer*. In doing so, they recognize the insidious nature of such extraneous information and how it strikes at the very core of the jury trial system. *See Dallego* ("And as Judge Friendly of the Second Circuit has aptly put it 'the principle that the jury may consider only matter that has been received in evidence is so fundamental that a breach of it should not be condoned if there is the slightest possibility that harm could have resulted.'") (*citing United States v. Adams*, 385 F.2d 548, 550-551 (2d Cir. 1967)).

when, remains. Carey Exhibits 3 and 4 go to the very heart of that fundamental question that the Jury was asked to decide. Their presentation to the jury necessitates a new trial.

II. **The Government Cannot Refute There Is More Than A Reasonable Possibility The Jury Viewed And Considered Carey Exhibits 3 and 4.**

The government asks the Court to undertake "a common sense review of the entire record." But recognizing such a review leads to the inescapable conclusion the jury listened to Carey Exhibit 3 and viewed Carey Exhibit 4. The government twists the record and asks the Court to presuppose answers to questions that were never asked of jurors.

For example, when Juror 9 was asked to open the binder prepared by the Court with the unadmitted exhibits that were provided to the jury, he testified as follows:

> THE COURT: If you'll look at the binder in front of you and flip through those four tabs and let me know when you're done.
> THE WITNESS: (Complies).
> THE COURT: Do you recall whether you saw any of the four exhibits in the binder in front of you during your deliberations?
> THE WITNESS: I believe I saw the flash drive, but I'm not 100 percent. But I believe I saw the flash drive.
> THE COURT: That specific flash drive? I know it's a picture of one. There might have been other flash drives. Do you know whether that was –
> THE WITNESS: No, that looks very familiar.
> THE COURT: Okay. And what about it looks familiar to you?
> THE WITNESS: The black color and the red writing.
> THE COURT: Okay. Do you know whether or not -- did you access any information on the flash drive that you recall? Or do you just recall seeing the flash drive?
> THE WITNESS: I recall seeing the flash drive. I believe we used the flash drive to -- on the TV to listen to a recording.
> THE COURT: Okay. But none of the others in that binder you recall seeing?
> THE WITNESS: No, sir.

(88:5 – 89:7).

Juror 9 identified the specific flash drive that contained Carey Exhibit 3 and testified that he remembered the jury "*listen[ing]* to a *recording*" (not watching a video) from that drive. Since Juror 9 testified that he specifically remembered the jury listening to the prejudicial extraneous information there was no reason for Maund (or any defendant) to ask additional questions; a clear

record had been created by Juror 9's testimony that he, along with rest of Jury, listened to Carey Exhibit 3. Further defense questioning on that point would have been repetitive.

The government was free to ask Juror 9 follow-up questions—the same questions they now ask the Court to presume the answer. For example, the government could have asked Juror 9 whether he was mistaken because another flash drive had red lettering; or whether Juror 9 recalled hearing the specific statement "Adam didn't know any of this shit"; or how long the audio Juror 9 testified that the jury "*listened*" to was[6]; or even whether Juror 9 was confused by the Court's focus on "flash drives" and also recalled hearing the same conversation played from a CD. But the government chose not to ask *any* of these questions—the answers to which bear heavily on the arguments it now advances. Lacking testimony it could have solicited, the government instead asks the Court to make assumptions about what Juror 9 would have said. But that was not the purpose of the *Remmer* hearing, and the Court cannot ignore the actual testimony before it and presuppose answers to questions that the government could have asked.

The government's make-lemonade-with-lemons approach is even worse with respect to Juror 11. Again, the Response focuses on the Government Exhibit 131, which contains a redacted (but albeit much longer version) of the audio contained in Carey 3. The government argues that Juror 11's statement about Carey 4 (the transcript of Carey Exhibit 3)—that "Some of it sounds familiar, but maybe not all of it"—should be interpreted by the Court as proof that what did *not* sound "familiar" to Juror 11 was the statement "Adam didn't know any of this shit." (*See* Resp. p. 13 ("Thus, Juror 11's memory is correct that some of the conversation sounded familiar (because she listened to Government Exhibit 131 during trial and deliberations) but "maybe not all of it" –

---

[6] Government Exhibit 131, which contains the redacted audio on Carey Exhibit 4, and which the government argues may have been the audio the jury listened to is fourteen minutes and eleven second (14:11) long. By contrast Carey Exhibit 4 is one minute and three seconds (1:03) long. An easy way to differentiate between the two would have been to ask jurors—like Jurors 9 and 11— if they remembered how long the audio clip they remember listening to was.

referring to Carey Exhibit 4 which is the transcript of Carey Exhibit 3 – because she did not review Carey Exhibits 3 and 4 containing the statement 'Adam didn't know any of this shit.'"). Yet this argument ignores the actual record. First, it assumes a fact that was never established—that Juror 11 listened to Government Exhibit 131. But More importantly it asks this Court to ignore the government's *own questioning* of Juror 11. The full extent of that brief questioning is below:

> Q. I understand -- good morning. I understand this is a challenging inquiry. I just want to make sure I understood your answer before. You said when Mr. Evans was asking you some questions about exhibit – the Exhibit 4 that's in front of you, you said some of it sounded familiar but some of it didn't; is that right?
> A. Yes.
> Q. And you're not able to say *what sounded familiar* and *what doesn't sound familiar*?
> A. I mean, am I allowed to give specifics?
> Q. Just answer the question the best way you can.
> A. Oh, okay. Like, I feel like I remember "but if you're mobile, they're never gonna find the original X." For some reason I think I remember that phrase. And I don't remember who said it off the top of my head. But it sounds familiar. That's the only one that I just really remember. Like, I'm pretty sure it was in dialogue at some point. I'm sorry.
> MR. McGUIRE: You don't have anything to apologize for. Thank you very much.
> THE COURT: All right, ma'am. Again, thank you for being here today. Please don't discuss with any of the other jurors your testimony here or the questions you were asked. And you're free to leave the courthouse.

(trans 70:17 - 71:17) (emphasis suppled). The government *asked* Juror 11 to describe both what does *and* "*what doesn't*" sound familiar. In response Juror 11 described a *specific* statement contained in both Carey Exhibit 3 and 4. The government could have pressed the issue, and followed up on the unanswered part of its original question: "what *doesn't* sound familiar." It chose not to, however. Just like the defendants, the government is represented by experienced trial counsel, skilled in questioning witnesses. Perhaps government counsel had good reason for not following up, fearing Juror 11 would offer more specifics about what she remembered, maybe going so far as identifying the statement "Adam didn't know any of this shit." Why it failed to do so, however, is just as immaterial as the answers the government now asks this Court to presuppose would have been given to questions it chose not to ask.

Juror 11's testimony is clear. When the Court asked if she "listen[ed] to any recorded

conversations from a flash drive or a USB drive" during deliberations she said "yes." (Trans 64:23 – 65:1). When the Court pressed her on "which conversations [she] listened to" she said "I believe one was conversation that was -- that took place in a car." (*id*. at 65:2-5). When Brockway's counsel asked her to read Carey Exhibit 4 and "tell me if this is something you recall hearing in one of the recordings" she stated "some of it maybe sounds familiar, but maybe not all of it." (Id. 69:19-70:1). When the government asked her to be more specific about what "she did and *didn't* remember" she identified the specific statement "'but if you're mobile, they're never gonna find the original X'," at which point the government abandoned its questioning.

The record before the Court is the actual testimony, not what the government wishes or believes may have been said to questions it failed to ask. The Court cannot ignore testimony that the Jury heard Carey Exhibits 3 (Juror 9 and Juror 11), saw Carey No. 4 (Juror 2), or the cumulative weight of testimony of all the jurors that they remember listening, in some way, to audio from flash drives.

### III. Maund Was Harmed by the Presentation of Unadmitted Evidence to the Jury, the Lack of Limiting Instruction, the Lack of Curative Instruction, and the Denial of his Opportunity to Present Admissible Evidence.

The government suggests that this Court should apply a harmless error standard.[7] But that is not the standard that applies. Well before *Remmer*, the Supreme Court has been clear: if a jury considers prejudicial extraneous information during deliberations then a defendant is deprived of their right to a fair trial. *See Krulewitch v. United States*, 336 U.S. 440 (1949) (when a trial court admits against all of the conspirators a relevant declaration of one of the conspirators after the conspiracy has ended, without limiting it to the declarant, it is not harmless error). There is good

---

[7] This is particularly apparent in the Response's conclusion, where it repeats some of the same salacious statements offered in interviews to the press and urges this Court ignore *Remmer* and its progeny because "[t]he proof against each [defendant] is overwhelming and includes their own recorded statements talking about either the murders themselves or the payment for the murders (or both)." (Resp. at 21)

reason for this standard—FRE 606 makes it impossible to inquire into how a jury considered extraneous prejudicial information and whether they would have reached the same result had they not considered such information.

The prejudicial nature of Carey Exhibits 3 and 4 were recognized by this Court when it determined that, if admitted, the statement "Adam didn't know any of this shit" would open the door to the presentation of additional evidence. *Both* Maund and Brockway were clear they would do so, including recalling Peled and offering evidence of a June Austin meeting which had been excluded. There is no more obvious prejudice than the Court's previous determination on the extraneous information at issue, making this case is unique among *Remmer* cases surveyed by Maund's counsel.

### IV.  Conclusion.

The government's Response is wrong about the applicable law, wrong about the record developed at the *Remmer* hearing, and wrong about the standard this Court should apply. For the foregoing reasons, and the reasons previously articulated in his original Motion for a New Trial on this issue, and Supplemental Brief in support, Maund respectively requests that this Court grant him a new trial.

Respectfully submitted,

**MINTON, BASSETT, FLORES & CARSEY**
*A Professional Corporation*
1100 Guadalupe
Austin, Texas   78701
Telephone: (512) 476-4873
Facsimile: (512) 479-8315

By: /s/*Samuel E. Bassett*
     SAMUEL E. BASSETT
     State Bar No. 01894100
     Email: sbassett@mbfc.com

     PERRY Q. MINTON
     State Bar No. 24063296

Email: pminton@mbfc.com

**SUMPTER & GONZÁLEZ, L.L.P.**
3011 N. Lamar Blvd., Ste 200
Austin, Texas 78705
Telephone: (512) 381-9955
Facsimile: (512) 485-3121

By: /s/*David M. Gonzalez*
  DAVID M. GONZALEZ
  State Bar No. 24012711
  DAVID@SG-LLP.COM

**BARNES & THORNBURG, L.L.P.**
827 19th Avenue, Ste. 930
Nashville, Tennessee 372203
Telephone: (615) 621-6019

By: /s/*J.D. Thomas*
  J.D. THOMAS
  Email: JD.Thomas@btlaw.com
  TN Bar No. 027582

**ATTORNEYS FOR DEFENDANT
ERIK MAUND**

## CERTIFICATE OF SERVICE

By my signature below, certify that on the 22nd day of July, 2024 a true and correct copy of Defendant's Supplemental Reply Brief was filed via the Court's ECF System which will distribute copies to all counsel of record.

/s/*J.D. Thomas*
J.D. Thomas